**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**

|  |  |  |
|---|---|---|
| BETTY WADE, as REPRESENTATIVE OF THE ESTATE OF DAVID HENEGAR, and DAVID JACOB HENEGAR | ) ) ) ) | Case No.: CV 323-073 |
| *Plaintiffs*, | ) ) ) | **JURY TRIAL DEMANDED** |
| *v.* | ) ) | |
| KEAMBRIAH MORGAN, JESSICA BLOUNT, TAMARA GRIER, LAKISHA FRANKLIN, ELLA MATHIS, TRACEY JOHNSON MCAFEE, SHYRA TAYLOR, VICTOR ROGERS, ANTOINE CALDWELL, EDGINALD GIBBONS, TIMOTHY WARD, Defendant Unknown Mental Health Supervisors, and Other Unknown Correctional Officers, | ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) | |

## COMPLAINT

Plaintiffs Betty Wade, as representative of the Estate of David Henegar, and David Jacob Henegar, by their attorneys with the law firm Loevy & Loevy, file this complaint against Defendants Keambriah Morgan, Jessica Blount, Tamara Grier, Lakisha Franklin, Ella Mathis, Tracy Johnson McAfee, Shyra Taylor, Victor Rogers, Antoine Caldwell, Edginald Gibbons, Timothy Ward, and other unknown correctional officers, and state as follows:

## INTRODUCTION

1. Over the course of hours on October 16, 2021, at Johnson State Prison in Wrightsville, Georgia, David Henegar was violently choked and beaten to death by his cellmate, Antone Hinton-Leonard.

2. This murder was tragically preventable.

1

3.     Defendant prison officials were within earshot during the lengthy attack on Mr. Henegar and could hear Mr. Henegar screaming, but did nothing to intervene.

4.     During the attack, prison officials saw Mr. Henegar on the floor of his cell, distressed and violently beaten, and did nothing to help.

5.     Fellow prisoners at Johnson State Prison yelled for help over the many hours the attack lasted, but prison officials did nothing to intervene.

6.     Defendants knew that Hinton-Leonard had beaten Mr. Henegar a week prior to his fatal assault, yet they did nothing to separate the two or otherwise protect Mr. Henegar.

7.     What's more, for weeks leading up to Mr. Henegar's death, Defendants Morgan, Blount, Grier, Franklin, Gibbons, and Mental Health Supervisors were aware that Mr. Hinton-Leonard's mental health was unstable and he was dangerous. Mr. Henegar had raised the alarm about his roommate's mental health to prison officials, and repeatedly asked correctional officers to move him to a different cell. Defendants ignored his requests.

8.     Tragically, Defendants' deliberate indifference to Hinton-Leonard's first attack on Mr. Henegar, decompensating mental state, and obvious dangerousness led straight to Mr. Henegar's death.

9.     Unfortunately Mr. Henegar's death was but one of a series of preventable homicides in Georgia prisons in recent years.

10.     Plaintiffs Betty Wade and David Jacob Henegar bring this complaint to redress the horrific death of their family member, David Henegar.

**Jurisdiction and Venue**

11.     This action is brought pursuant to 42 U.S.C. § 1983 to remedy the Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

12.     This action is also brought pursuant to O.C.G.A. § 51-4-2 to redress Plaintiff's wrongful death and Plaintiff's Estate claims for funeral and burial expenses.

13.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claim pursuant to 28 U.S.C. § 1367.

14.     Venue is proper under 28 U.S.C. § 1391(b), as the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

**Parties**

*Plaintiff*

15.     Mr. Henegar was a prisoner at Johnson State Prison and was 44 years old when he was brutally choked and beaten to death by his cellmate.

16.     Betty Wade was David Henegar's sister and is the Personal Representative of Mr. Henegar's Estate.

17.     David Jacob Henegar was Mr. David Henegar's son.

*Defendants*

18.     Plaintiffs sue each of the Defendants listed below in their individual capacities.

19.     Each of the Defendants listed below acted under color of law and within the scope of his or her employment when engaged in the misconduct described herein.

20.     Each of the Defendants listed below is above the age of majority.

21.     Defendant Victor Rogers was a correctional officer assigned to patrol the J Block on October 16, 2021, and the weeks leading up to Mr. Henegar's murder.

22.     Defendant Tracy Johnson McAfee was a correctional officer stationed on duty in the J Block on October 16, 2021, and the weeks leading up to Mr. Henegar's murder.

23.     Defendant Jessica Blount was a correctional officer at Johnson State Prison at all times relevant to this lawsuit.

24.     Defendant Keambriah Morgan was a correctional officer at Johnson State Prison at all times relevant to this lawsuit.

25.     Defendant Ella Mathis was a sergeant at Johnson State Prison at all times relevant to this lawsuit, and was the assigned shift supervisor on October 16, 2021.

26.     Defendant Shyra Taylor was a lieutenant at Johnson State Prison at all times relevant to this lawsuit. She was responsible for the safety of the prisoners at Johnson State Prison, for monitoring and supervising the prisoners, as well as for subordinate staff.

27.     Defendant Tamara Grier was a Unit Manager at Johnson State Prison at all times relevant to this lawsuit.

28.     At all times relevant to this lawsuit, Defendant Unknown Mental Health Supervisors were supervisors in the mental health unit at Johnson State Prison.

29.     Defendant Lakisha Franklin was the Deputy Warden of Care and Treatment at Johnson State Prison at all times relevant to this lawsuit.

30.     Defendant Antoine Caldwell was the Warden at Johnson State Prison at all times relevant to this lawsuit.

31.     Defendant Edginald Gibbons was Deputy Warden of Security at Johnson State Prison at all times relevant to this lawsuit.

32.     Defendant Timothy Ward was the Commissioner of Georgia Department of Corrections at all times relevant to this lawsuit.

33.     Collectively, Defendants Ward, Caldwell, and Gibbons are referred to as the "Defendant Supervisors."

**Defendants Failed to Protect Mr. Henegar from a**
**Known and Substantial Risk of Serious Harm**

***Hinton-Leonard Exhibits Obvious Signs of Being Extremely Dangerous***

34.    From the time Hinton-Leonard was assigned as Mr. Henegar's cellmate in August 2021, Mr. Henegar expressed concern about the mental health of his cellmate.

35.    Early on after Hinton-Leonard first arrived in the shared cell, Mr. Henegar expressed concern about his cellmate's hygiene.

36.    Hinton-Leonard went weeks without showering or changing his clothes, and smelled foul.

37.    He ate his meals with his hands.

38.    Hinton-Leonard also had obvious psychotic episodes. For instance, he regularly had conversations with himself.

39.    At times he remained awake all night, ranting about various subjects and frightening Mr. Henegar.

40.    For weeks Mr. Henegar was notifying prison officials, including but not limited to Defendant Blount and Defendant Mental Health Supervisors, that Hinton-Leonard was in mental distress and dangerous.

41.    In addition to these complaints, Hinton-Leonard's mental condition was serious and obvious to everyone who encountered him, including Defendants Blount, Morgan, Grier, McAfee, Rogers, Mathis, and Taylor.

42.    For instance, in September 2021, Defendant Blount witnessed one of Hinton-Leonard's disturbing episodes.

43.    Based on Hinton-Leonard's behavior, Mr. Henegar again tried to get himself or Hinton-Leonard reassigned to a different cell. This time, he asked Defendant Blount directly.

44.     Defendant Blount ignored Mr. Henegar's request.

45.     In September 2021, Mr. Henegar sent a letter to prison officials, including Defendant Mental Health Supervisors and Defendants Franklin and Gibbons. In it, he stated that Hinton-Leonard was not receiving his medicine and was a danger to both Mr. Henegar and himself.

46.     Defendants Blount, Morgan, Grier, McAfee, Rogers, and Mathis, Taylor, Franklin, and Gibbons took no steps to secure Mr. Henegar's safety or separate the cellmates in response to Mr. Henegar's complaints or their own direct observations of Hinton-Leonard's dangerousness.

### *Hinton-Leonard Chokes Mr. Henegar Nearly to Death and Mr. Henegar Reports the Incident*

47.     On or around October 9, 2021, a mere week before Hinton-Leonard murdered Mr. Henegar, Hinton-Leonard choked Mr. Henegar in their shared cell until Mr. Henegar lost consciousness.

48.     Mr. Henegar reported this assault to Defendant Grier and requested that either he or Hinton-Leonard be moved because of the danger his cellmate posed.

49.     As a Unit Manager, Defendant Grier was responsible for prisoner custody and movement.

50.     Defendant Grier ignored Mr. Henegar's request.

51.     In addition, on or around October 11, 2021, Mr. Henegar told Defendant Morgan and two male officers that he wanted to move to a different cell because his cellmate was dangerous.

52.     Rather than do anything to separate the cellmates, the two male officers encouraged Mr. Henegar to hit Hinton-Leonard, but Mr. Henegar refused.

53.     Defendant Morgan also told Mr. Henegar she would move him, but she never did.

6

54.     Despite knowing that Hinton-Leonard had attacked Mr. Henegar in their cell, Defendants Grier, Morgan, and Blount took no steps to keep Mr. Henegar free from future harm at Hinton-Leonard's hands.

55.     As but one example, once Defendants Grier, Morgan, and Blount became aware of the serious danger Hinton-Leonard posed, they should have at a minimum regularly searched the cell for weapons. Had they done so, they would have discovered that Hinton-Leonard had a leather belt—contraband at Johnson State Prison—because it can be used as a weapon.

56.     Johnson State Prison had policies and procedures in place to keep Mr. Henegar free from harm from cellmates like Hinton-Leonard, including reclassifying and segregating prisoners like Hinton-Leonard if they exhibited adverse behavior.

57.     Yet, Defendants took no steps to enforce these policies and protect Mr. Henegar from the danger presented by Hinton-Leonard.

58.     Additionally, given the clear danger Hinton-Leonard presented, Johnson State Prison officials should have conducted more cell checks of the cell Hinton-Leonard and Mr. Henegar shared to ensure Mr. Henegar's safety.

59.     Alternatively, once Plaintiff expressed his fear of Hinton-Leonard to various Defendants, Defendants should have transferred Hinton-Leonard to an area in which he received more cell checks.

### *As Expected, Hinton-Leonard Attacked Mr. Henegar Again, Leading to His Tragic Death*

60.     Hinton-Leonard's assault on Mr. Henegar began in the early hours of October 16, 2021, in a locked cell in the J Dorm of Johnson State Prison.

61.     Hinton-Leonard used a piece of cloth to bind Mr. Henegar's hands behind his back, and bound Mr. Henegar's feet together with a leather belt.

62.     Over the next hours, Hinton-Leonard brutally beat and choked Mr. Henegar.

63.    During the attack, Hinton-Leonard stomped on Mr. Henegar's chest and strangled him. Hinton-Leonard broke Mr. Henegar's neck and multiple ribs, caused acute damage to his organs, and fractured his sternum. Hinton-Leonard caused internal bleeding and a brain hemorrhage.

64.    Neighboring prisoners could hear screams coming from Mr. Henegar's cell for at least an hour during the attack.

65.    Fellow prisoners in the J Dorm and Mr. Henegar repeatedly called out to guards for help.

66.    However, no officer intervened to stop the attack.

67.    Defendant Rogers was the officer on duty in the J Dorm while Mr. Henegar was murdered. He was responsible for patrolling the J Dorm and responding to inmate-on-inmate violence.

68.    Defendant Mathis was the shift supervisor assigned to J Dorm during the night of the attack and in the weeks leading up to it. As shift supervisor, she was responsible for ensuring that staff were where they were supposed to be and were carrying out their duties, ensuring that contraband searches were conducted, and responding to inmate-on-inmate violence, among other responsibilities.

69.    Defendant Rogers was within earshot and eyeshot of Mr. Henegar's cell during the fatal attack.

70.    On information and belief, Defendant Mathis also overheard Mr. Henegar's and other inmates' screams for help.

71.    In addition, Defendant McAfee and other correctional officers in the J Dorm heard Mr. Henegar and other prisoners yelling for help, but did nothing.

72.     Around 6:50 a.m., Defendant Rogers saw Mr. Henegar on the ground, beaten and covered in bruises, but still moving.

73.     Defendant Rogers and the other officers on shift provided no assistance to Mr. Henegar at that time.

74.     The beating continued for hours, but eventually, just before 9:15 a.m., Mr. Henegar's screams stopped.

75.     At or around 9:15 a.m., Defendant McAfee discovered Mr. Henegar dead in his locked cell.

76.     Mr. Henegar was found with his arms tied behind his back with a piece of white cloth, and his legs tied with a brown leather belt.

77.     Mr. Henegar was warm to the touch when the coroner arrived, meaning that had died very recently.

78.     The coroner determined that Mr. Henegar died of manual strangulation and blunt force injuries.

79.     During the hours-long attack, Defendants Rogers, Mathis, and McAfee, had ample opportunity to intervene and stop the attack and/or move Mr. Henegar to safety but never did.

80.     Indeed, had any Defendant intervened while the Hinton-Leonard was beating Mr. Henegar, or after observing Mr. Henegar lying on the ground, Mr. Henegar would have survived.

### *An Escalating Culture of Violence in Georgia Prisons*

81.     Prior to the fatal attack on Mr. Henegar on October 16, 2021, Defendants Caldwell, Gibbons, and Ward of the Georgia Department of Corrections were on notice of an increased culture of violence in Georgia prisons in which inmate violence was endemic; mentally

ill or dangerous inmates were improperly classified and not segregated; and inmates lived in fear of their lives.

82.    As the Warden at Johnson State Prison, Defendant Caldwell was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at Johnson State Prison, and the supervision of all subordinate employees.

83.    As the Deputy Warden of Security at Johnson State Prison, Defendant Gibbons was responsible for maintaining the safety and security of all prisoners at Johnson State Prison and supervising security staff members, as well as overseeing the rotation of security posts.

84.    As the Commissioner of Georgia Department of Corrections, Defendant Ward was the highest-ranking official in the Georgia Department of Corrections and was responsible for the direction, supervision, and control of the Department of Corrections.

85.    Between 2020 and 2022, Mr. Henegar was 1 of at least 57 inmates murdered in Georgia Department of Corrections.

86.    That is nearly triple the number of inmates who died by homicide in Georgia Department of Corrections prisons between 2018 and 2019.

87.    Should this rate persist, Georgia's prison homicide rate will reach 63 homicides per 100,000 inmates—eight times the national rate.

88.    Georgia currently has the third highest prison death rate from unnatural causes of all 50 states.

89.    In November 2020, roughly a year before Mr. Henegar's murder, a prisoner at Johnson State Prison was killed in similar circumstances, as he was assaulted to death by another inmate.

90.    In September 2021, in response to the increasing rate of inmate-on-inmate homicides in GDC, the United States Department of Justice took the highly unusual step of launching a public investigation into the increased violence at GDC.

91.    The Department of Justice publicly announced that the investigation would "examine whether Georgia provides prisoners reasonable protection from physical harm at the hands of other prisoners." The investigation has focused on the increased violence among inmates and its cause.

92.    Additionally, in the time leading up to Mr. Henegar's death, contraband weapons proliferated at Georgia prisons.

93.    In July 2022, correctional officers in five Georgia prisons seized thousands of contraband items during a series of unannounced shakedowns. The Georgia Department of Corrections announced that they had seized roughly 650 contraband weapons during the search.

94.    Defendant Supervisors were aware of the increased violence in Georgia prisons, but took no steps to address it.

95.    For instance, GDC enacted policies by which correctional staff needed to report threats of serious harm from mentally unstable inmates, and take steps to reclassify those dangerous inmates so they would not be housed with cellmates.

96.    Defendant Supervisors knew that these policies were not being followed, but did nothing to address this problem.

*A Staffing Crisis at Georgia Prisons*

97.     The Assistant Attorney General for Civil Rights at the United States Department of Justice, Kristen Clarke, identified Georgia prisons' extreme staffing shortage as one of the factors causing insufficient supervision and increased violence.

98.     With fewer guards, it becomes exponentially more difficult for prison officials to supervise prisoners, prevent violence from breaking out, and ensure prisoners' timely access to medical care.

99.     As of August 2021, Georgia prisons were understaffed by as much as 75%.

100.    Between 2010 and 2021, the GDC prisoner population declined by 5%, while GDC prison staff declined by 35%.

101.    At a September 2021 state congressional hearing, a guard testified that on a good day, there were 6-7 officers to supervise 1,200 prisoners at Lee Arrendale State Prison. That breaks down to one guard for every 200 prisoners.

102.    By comparison, the Federal Bureau of Prisons recommends a baseline staffing ratio of one guard for every 15 prisoners.

103.    The guard also testified that prison officials "lack the ability to get [prisoners] to our medical facility due to the fact that we lack the number of officers to get them up there and also because we don't have enough medical staff to be able to treat all of them."

104.    Defendant Commissioner Ward was aware of the staffing shortages in Georgia prisons prior to, and immediately leading up to, Mr. Henegar's death in October 2021.

105.    In September 2021, the watchdog organization "They Have No Voice" wrote an open letter to Defendant Ward, detailing the security issues in Georgia prisons caused by

understaffing and requesting that the Georgia National Guard be deployed to Georgia's prisons. Ward did not respond.

106.    At a Georgia Department of Corrections budget hearing in January 2022, Defendant Ward testified that Georgia Department of Corrections was facing a 49% turnover rate among its staff, but did not propose a solution to the staffing shortage or request assistance to identify a solution.

107.    Defendant Ward was aware of the staffing issues and resulting security crisis at Georgia prisons in the years prior to Mr. Henegar's murder, but did not take any steps to address these issues.

108.    Defendant Ward's failure to act placed prisoners like Mr. Henegar at substantial risk of serious harm and ultimately led to his death.

109.    Prior to being incarcerated, Mr. Henegar was a trained welder and mechanic who had been consistently employed as a welder, truck mechanic, and machinist. While incarcerated, Mr. Henegar shared his skills with others and taught friends how to weld. Had Mr. Henegar survived, he would have sought continued employment as a welder and mechanic.

110.    But for Johnson State Prison officials' inaction relating to Mr. Henegar and Hinton-Leonard, Mr. Henegar would still be alive.

111.    Ms. Wade and David Jacob Henegar timely sent an ante litem notice on September 30, 2022, via certified mail. The notice and proofs of delivery are attached hereto as Exhibit A.

**Count I**
**42 U.S.C. § 1983—Eighth Amendment—Failure to Protect**
**Against Defendant Morgan, Defendant Grier, Defendant Blount, Defendant Gibbons,**
**Defendant Rogers, Defendant McAfee, Defendant Mathis, and Defendant Franklin**

112.    Plaintiff incorporates by reference and as if fully restated here paragraphs 34-80 of this Complaint.

113.    Pursuant to the Eighth Amendment of the United States Constitution, a prison official who is aware of a substantial risk of serious harm to a prisoner must reasonably respond to that risk.

114.    Doing nothing in the face of a serious risk of harm to an inmate is not a reasonable response.

115.    Defendants Morgan, Grier, Blount, Gibbons, and Franklin were aware that Hinton-Leonard posed a serious risk of harm to Mr. Henegar. Specifically:

116.    Defendants Morgan, Grier, Blount, Gibbons, Franklin, Rogers, Mathis, Taylor, and other officers were informed by Mr. Henegar himself in the weeks leading up to his death that Hinton-Leonard posed a serious danger of physical violence.

117.    Grier, Blount, Franklin, Rogers, Mathis, Taylor, and other officers had also received multiple requests from Mr. Henegar to be moved to a different cell, away from Hinton-Leonard, because Hinton-Leonard posed a serious and known danger to Mr. Henegar.

118.    For weeks leading up to Mr. Henegar's death, Defendants were aware that Hinton-Leonard was mentally unstable, dangerous, and posed a serious risk of harm to Mr. Henegar.

119.    Defendants Grier and others were aware that a week before the murder, Hinton-Leonard choked Mr. Henegar until Mr. Henegar lost consciousness.

120.    Defendants Rogers, Mathis, McAfee, and Taylor learned that Hinton-Leonard was mercilessly attacking Mr. Henegar on October 16, and in doing so posed a serious risk to Mr. Henegar. At no point during the attack did any of these Defendants take any reasonable step to address that risk.

121.    These Defendants' failure to separate Hinton-Leonard and Mr. Henegar or otherwise take any reasonable step to address the risk Hinton-Leonard posed, including conduct more frequent cell checks, despite their knowledge of that risk, was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the Mr. Henegar's rights, and was objectively unreasonable.

122.    These Defendants' failure to take any reasonable steps to protect Mr. Henegar directly and proximately caused Mr. Henegar to suffer horrific physical and emotional injuries, pain, suffering, and death.

**Count II**
**42 U.S.C. § 1983—Eighth Amendment—Failure to Intervene**
**Against Defendants Rogers, Mathis, McAfee, and Taylor**

123.    Plaintiff incorporates by reference and as if fully restated here paragraphs 60-80 of this Complaint.

124.    Pursuant to the Eighth Amendment of the United States Constitution, a prison official who is aware of an ongoing serious harm to a prisoner must take reasonable steps to intervene.

125.    Doing nothing in the face of ongoing serious harm to an inmate is not a reasonable intervention.

126.    Defendant Rogers, Mathis, and McAfee were aware that Mr. Henegar was being brutally attacked, because they could hear Mr. Henegar and other inmates screaming for help.

15

127.    Defendant Mathis, McAfee, and Taylor were aware of Mr. Henegar's serious medical need because they could hear Mr. Henegar screaming in pain while he was slowly beaten to death.

128.    In addition, Defendant Rogers saw Mr. Henegar on the ground in his locked cell, beaten and in obvious physical distress, but alive.

129.    Defendant Rogers, Mathis, and McAfee were in a position to stop the attack, but took no reasonable steps to do so.

130.    These Defendants' failure to separate Hinton-Leonard and Mr. Henegar or otherwise take any steps to stop the attack, was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the Mr. Henegar's rights, and was objectively unreasonable.

131.    These Defendants' failures to intervene during Mr. Henegar's hours-long murder directly and proximately caused Mr. Henegar to suffer horrific physical and emotional injuries, pain, suffering, and death.

**Count III**
**42 U.S.C. § 1983—Eighth Amendment—Denial of Adequate Medical Care,**
**Against Defendants Rogers, Mathis, McAfee, and Taylor**

132.    Plaintiff incorporates by reference and as if fully restated here paragraphs 60-80 of this Complaint.

133.    Pursuant to the Eighth Amendment of the United States Constitution, Mr. Henegar was entitled to appropriate medical care while suffering from a serious medical need.

134.    Defendants Rogers, Mathis, McAfee, and Taylor denied Mr. Henegar this right when they became aware of Mr. Henegar's serious medical need as he lay dying on October 16, 2021, yet took no steps to provide or otherwise ensure he received care.

135.    Specifically, Defendant Rogers was aware that Mr. Henegar was in serious medical distress because he saw him lying on the floor severely beaten but still alive.

136.    Defendants Mathis, McAfee, and Taylor were aware of Mr. Henegar's serious medical need because they could hear Mr. Henegar screaming in pain while he was slowly beaten to death.

137.    None of these defendants took any steps to provide or procure medical care for Mr. Henegar.

138.    Had Defendants provided medical care to Mr. Henegar at any point during his fatal beating, he would have survived. Thus, these Defendants' failures to provide medical care during Mr. Henegar's hours-long murder directly and proximately caused Mr. Henegar to suffer horrific physical and emotional injuries, pain, suffering, and death.

139.    These Defendants' failure to provide medical care for Mr. Henegar was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the Mr. Henegar's rights, and was objectively unreasonable.

**Count IV**
**42 U.S.C. § 1983—Fourteenth Amendment—Due Process**
**Against Defendants Rogers, Mathis, McAfee, and Taylor**

140.    Plaintiff incorporates by reference and as if fully restated here paragraphs 60-80 of this Complaint.

141.    The custodial relationship between an inmate and a prison official gives rise to a constitutional duty on the part of the official to protect the inmate.

142.    Defendants Rogers, Mathis, McAfee, and Taylor violated this duty and therefore violated Mr. Henegar's substantive due process right when they failed to protect him from the known danger Hinton-Leonard presented.

143.    Even as Mr. Henegar could be heard dying and begging for his life, Defendants Rogers, Mathis, McAfee, and Taylor refused to step in and save his life.

144.    As discussed in Paragraphs 62–78, Defendants' refusal to do a single thing to stop Hinton-Leonard from beating Mr. Henegar to death or provide Mr. Henegar with medical care, despite their awareness of it and ample opportunities to do so, were abhorrent and shocking to the conscience.

**Count V**
**42 U.S.C. § 1983—Eighth Amendment—Failure to Supervise**
**Against Defendants Franklin, Caldwell, Gibbons, and Ward**

145.    Plaintiff incorporates by reference and as if fully restated here paragraphs 81-111 of this Complaint.

146.    Defendant Supervisors are liable for the constitutional deprivations described in Counts I-IV because there is a causal connection between their actions and/or failures to act and those constitutional deprivations.

147.    Defendant Supervisors are liable for the constitutional deprivations described in Counts I-IV because they were aware of the safety crisis in Georgia prisons and needed to take reasonable measures to stem it, but deliberately chose not to.

148.    More specifically, Defendants Franklin, Caldwell, and Gibbons were aware of an escalating culture of violence and a staffing crisis at Johnson State Prison, while Defendant Ward was aware of the increasing violence and staffing issues at Georgia state prisons.

149.    Prior to Mr. Henegar's death, Defendants Franklin, Caldwell, Gibbons, and Ward were aware of the escalating rates of inmate violence and homicides, the proliferation of

contraband weapons, and the lack of staff necessary to ensure prisoner safety in Georgia prisons generally and at Johnson State Prison in particular.

150.    Even so, Defendants Franklin, Caldwell, Gibbons, and Ward did nothing to address these crises.

151.    Defendants Franklin, Caldwell, and Gibbons also failed to enforce policies to ensure that mentally ill or dangerous inmates were properly classified and segregated, or that inmates who were attacked by other inmates would not be forced to share a cell with their assailants following an attack.

152.    Defendants Franklin, Caldwell, and Gibbons also failed to enforce policies by which prison officials would investigate and discipline acts of violence, which emboldened violent prisoners and encouraged a culture of violence in Georgia prisons.

153.    Defendants Franklin, Caldwell, and Gibbons failed to take reasonable measures to protect prisoners from known threats to their safety by failing to identify and separate prisoners with a known history of violence toward specific people from those people, failing to adequately respond to prisoners who raised concerns about their safety, and/or failing to train and discipline subordinates whose known misconduct contributed to these policies and practices.

154.    Additionally, Defendant Ward failed to take reasonable measures to stem the tide of increasing violence in Georgia state prisons to prevent inmate homicides, including but not limited to addressing the staffing shortage.

155.    Defendants Franklin, Caldwell, Gibbons, and Ward therefore had both actual and constructive notice of the widespread violence inside Johnson State Prison and endemic to prisons across the state in the time period leading up to Mr. Henegar's murder.

156.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Henegar, and was objectively unreasonable.

157.    These Defendants' misconduct directly and proximately caused Mr. Henegar to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries, pain, suffering, and death.

158.    Additionally, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at Johnson State Prison and the Georgia Department of Corrections writ large, which occurred with the consent of Defendants Franklin, Caldwell, Gibbons, and Ward, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by their actions or by their deliberate indifference and failed to act.

**Count VI**
**State Law—Negligence**
**Against Defendants Morgan, Grier, Blount, Gibbons, Rogers, McAfee, Franklin, Mathis, and Ward**

159.    Plaintiff incorporates by reference and as if fully restated here paragraphs 34-111 of this Complaint.

160.    Plaintiff was in the custody and care of Defendants.

161.    Defendants had a duty of care to Mr. Henegar, including to safely house him, to protect him from harm by other prisoners, and to ensure the provision of adequate medical care to inmates who have serious medical needs.

162.    Defendants Grier, Morgan, Blount, Franklin, Gibbons, McAfee, Rogers, Mathis, and Taylor breached this duty when they took no steps to separate Hinton-Leonard and Mr. Henegar so they no longer lived together, despite Mr. Henegar's repeated pleas to be moved to a

separate cell and even after Hinton-Leonard choked Mr. Henegar to the point of unconsciousness.

163. Defendants Grier, Morgan, Blount, Franklin, Gibbons, McAfee, Rogers, Mathis, and Taylor also breached this duty when they failed to conduct more frequent cell checks to ensure Plaintiff's safety.

164. These Defendants' breach of duty was a direct and proximate cause of Mr. Henegar's death.

165. Defendants Rogers, Mathis, McAfee, and Taylor breached this duty when they heard Mr. Henegar's screams for help in the hours before his death but failed to take any reasonable steps to stop the assault.

166. In addition, Defendant Rogers breached this duty when he witnessed Mr. Henegar on the floor near his cell door in the hours before death, but failed to take any reasonable steps to check on him or tend to his safety.

167. Defendants Rogers, Mathis, Taylor, and McAfee's failures to separate Hinton-Leonard from Mr. Henegar, and failures to intervene during the hours-long assault were direct and proximate causes of Mr. Henegar's death.

168. Supervisor Defendants breached this duty when they failed to take any steps to address the staffing, inmate-on-inmate violence, and contraband problems at Johnson State Prison.

169. Supervisor Defendants' breach of duty was a direct and proximate cause of Mr. Henegar's death.

170. Mr. Henegar's death was a foreseeable result of each of these failures discussed.

**Count VII**
**O.C.G.A. § 51-4-2—State Law—Wrongful Act or Omission Resulting in Death**
**Against Defendants Morgan, Grier, Blount, Gibbons, Rogers, McAfee, Franklin, Mathis,**
**and Ward**

171.    Plaintiff incorporates by reference and as if fully restated here paragraphs 34-111 of this Complaint.

172.    A surviving child may recover the full value of the life of a parent, where that parent dies by homicide and where there is no surviving spouse.

173.    Homicide is defined under the statute as "the death of a human being result[ing] from a crime, from criminal or other negligence."

174.    Mr. Henegar does not have a surviving spouse.

175.    Mr. Henegar's son, David Jacob Henegar, brings this claim under Georgia's Wrongful Death Act.

176.    Mr. Henegar died by homicide due to the negligence of Defendants Morgan, Grier, Blount, Gibbons, Rogers, McAfee, Franklin, Mathis, and Ward as described in Count VI.

177.    Mr. Henegar was a trained welder and mechanic who had been consistently employed in trade positions, including as a welder, truck mechanic, and machinist.

178.    His life had value and, given his skillset, he had high earning potential.

179.    David Jacob Henegar seeks to recover for the full tangible and intangible value of his father's life. David Jacob Henegar claims damages for the wrongful death of his father, and for the loss of his services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel and advice, as well as for the mental anguish caused by this loss, as well as for funeral and other expenses and damages in accord with the Georgia Wrongful Death Act.

WHEREFORE, Plaintiffs Betty Wade, as representative of the Estate of David Henegar, and David Jacob Henegar, respectfully request that this Court enter a judgment in Plaintiffs' favor and against all Defendants, awarding compensatory damages, punitive damages, and attorneys' fees and costs against each Defendant, jointly and severally, as well as funeral, burial, and probate expenses, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

/s/ Gerald Weber
Gerald Weber
Georgia Bar No. 744878
*Attorney for Plaintiff*

Gerald Weber
Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, GA 31107
(404) 522-0507
wgerryweber@gmail.com

Rachel Brady (Illinois Bar No. 6312402), *pro hac vice application forthcoming*
Annie Prossnitz (Illinois Bar No. 6878979), *pro hac vice application forthcoming*
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312-243-5900
brady@loevy.com
prossnitz@loevy.com

# Exhibit A

# LOEVY & LOEVY

311 N. Aberdeen St., 3rd Floor, Chicago, Illinois 60607

September 30, 2022

*Via U.S. Certified Mail*
*Receipt No.* **7022 0410 0003 4919 0008**
Department of Administrative Services
Risk Management Services
200 Piedmont Avenue
Suite 1220, West Tower
Atlanta, Georgia 30334

*Via U.S. Certified Mail*
*Receipt No.* **7022 0410 0003 4919 2514**
Georgia Department of Corrections
300 Patrol Road
Forsyth, Georgia 31029

*Via U.S. Certified Mail*
*Receipt No.* **7022 0410 0003 4918 9620**
Department Headquarters
7 MLK Jr Drive
Suite 543
Atlanta, Georgia 30334

RE:    *Ante Litem* **Notice Pursuant to O.C.G.A. § 50-21-26**
Injured Party: David Lamar Henegar (GDC #919573)
Date of Death: October 16, 2021
Incident Site: Johnson State Prison

Greetings:

Undersigned counsel represents Betty Wade, as personal representative of the Estate of Mr. David L. Henegar ("the Estate"), and Mr. David Jacob Henegar, the son of David L. Henegar. Mr. Henegar was incarcerated in Johnson State Prison ("JSP") until October 16, 2021, when he was murdered by his cellmate. The Estate and David Jacob Henegar intend to file a federal lawsuit against Georgia Department of Corrections ("GDC") Commissioner Timothy C. Ward, then-JSP Warden Antoine Caldwell, then-JSP Deputy Warden of Security Edginald Gibbons, Officer Blount, and several other individuals, regarding the events that led to Mr. Henegar's tragically preventable death. The purpose of this letter is to comply with any and all statutory *ante litem* notice requirements.

Page 2 of 12
*Ante Litem* Notice re: David L. Henegar

The Estate and David Jacob Henegar warrant compensation for the multiple civil rights and state law violations Mr. Henegar experienced at the hands of GDC and Johnson State Prison officials, ultimately leading to his torture and death. We suggest discussing the possibility of settling these claims before we file a lawsuit.

<u>Facts Underlying Claims</u>

On October 16, 2021, Mr. Henegar was found dead inside a locked two-person cell at Johnson State Prison with his cellmate, Antone Hinton-Leonard (GDC #1002834473). Mr. Henegar's hands and feet were bound, and he had been severely beaten all over his arms, torso, and head. Mr. Henegar's death was a homicide, the cause of which was "Manual Strangulation and Blunt Force Injuries of the Head, Torso, and Extremities."

This murder was tragically foreseeable and preventable, both in the weeks leading up to it while Mr. Henegar repeatedly told JSP officials that his cellmate attacked and threatened him and was mentally unstable, and requested a cell transfer for his safety; *and* the immediate hours during the attack while Mr. Henegar and other inmates in the J block of Mr. Henegar's dorm hollered and begged for a guard to come help. Indeed, other inmates, and every prison official who passed through the J dorm, could hear Mr. Henegar screaming for hours as Hinton-Leonard slowly beat him to death, but rather than intervening, JSP staff let Mr. Henegar die slowly. Corrections officers at JSP had weeks of opportunities to prevent this murder, but rather than take any steps to keep Mr. Henegar safe, they fanned the flames of Hinton-Leonard's aggression toward Mr. Henegar, ultimately resulting in Mr. Henegar's murder.

I.    **JSP Staff Were Aware for Weeks that Hinton-Leonard Posed a Serious Risk to Mr. Henegar**

    A.    <u>In the Weeks Before He Was Murdered, Mr. Henegar Repeatedly Alerted JSP Staff that Hinton-Leonard Posed a Serious Risk</u>

As for the earlier opportunities JSP staff had to prevent this murder: Mr. Henegar alerted prison guards and officials multiple times that his cellmate was unstable and dangerous, and asked time and again for weeks to be transferred to another cell, or to have his cellmate transferred. Mr. Henegar was ignored.

Hinton-Leonard suffers from mental illness and was known to be unstable and violent. In the weeks leading up to the October 16, 2021 attack, JSP staff failed to ensure Hinton-Leonard took his prescribed mental-illness medication. Hinton-Leonard had gone weeks without his medication. For weeks, Mr. Henegar notified prison officials, including Officer Blount and the Mental Health Supervisors, that Hinton-Leonard was a danger. But this was no surprise. Hinton-Leonard's state was obvious to anyone who encountered him. He was filthy and smelled foul. He had gone weeks without so much as a shower or a change of clothes. Mr. Henegar repeatedly reported to his counselor and other guards, including Unit Manager Grier, dorm officer Morgan and two others, that his cellmate was in a terrible state and that he felt that his cellmate was a danger to him. No one took a single step to ensure Hinton-Leonard received his medication *or* separate the cellmates.

Page 3 of 12
*Ante Litem* Notice re: David L. Henegar

### B.  Hinton-Leonard Attacked Mr. Henegar the Week Before Killing Him

On October 9, 2021, as predicted, Hinton-Leonard attacked Mr. Henegar. Hinton-Leonard choked Mr. Henegar until he lost consciousness. Mr. Henegar reported this assault and requested a cell transfer, but his requests were ignored, and not one JSP official took a single step to keep him safe. Instead, Mr. Henegar was forced to live in fear every day for the rest of his life that Hinton-Leonard would attack him again.

### C.  Hinton-Leonard Should Not Have Been Housed with a Cellmate

The manner and circumstances of Mr. Henegar's death are a foreseeable consequence of the deliberate indifference to inmate health and safety by JSP staff. The policy on this point is clear: inmates with mental illness, like Hinton-Leonard, pose a serious risk to other inmates and are not to be housed with cellmates.

Moreover, there were other instances in which JSP staff should have placed Mr. Hinton-Leonard in administrative or disciplinary segregation: after he missed his medication for multiple days in October 2021, and after he assaulted Mr. Henegar on October 9, 2021. If JSP staff had done any of these things, all of which are required by GDC policy, Hinton-Leonard would not have killed Mr. Henegar.

## II.    JSP Staff Were Aware for Hours on October 16, 2021 that Mr. Henegar Was Being Attacked, but Did Nothing.

Not only did JSP staff have multiple opportunities to save Mr. Henegar's life in the weeks leading up to his murder, but JSP officials were made aware of Hinton-Leonard's specific danger to Mr. Henegar in the hours leading up to his death. JSP officials knew Mr. Henegar was in acute medical distress for hours before his death, and at any point during those hours could have saved Mr. Henegar's life. But in an egregious display of deliberate indifference for Mr. Henegar's life, Mr. Henegar was ignored.

First, according to nearby inmates, everyone in the vicinity could hear the attack. While the attack was ongoing, other inmates in the cellblock were calling out to guards to help Mr. Henegar. Multiple corrections officers, including Victor Rogers, heard the cries for help and the attack itself, but no one intervened in any way.

In addition to hearing these cries for help, JSP staff saw with their own eyes Mr. Henegar lying on the floor, covered in bruises and cuts, hours before he died. During their rounds at 6:50 a.m., correctional officers, including but not limited to Victor Rogers, saw Mr. Henegar on the floor near his cell door, where he was lying after Hinton-Leonard began attacking him. He was already covered in visible cuts and bruises on his hands, wrists, arms, and face, but he was moving. The officers ignored him. Compounding that, Mr. Henegar also suffered from epilepsy that caused serious seizures, and, given that he was on the floor, protocol required guards to check on him. Instead, they walked away.

EXHIBIT A

Mr. Henegar's dead body was discovered at 9:15 a.m., more than two hours after the attack began. His arms were tied behind his back with a cloth ligature and his legs were bound and tied to a bedpost using a leather belt, and he was still warm to the touch when EMS arrived five minutes later. This means he had died only recently. It also means that at any point between 6:50 a.m. when JSP staff saw him lying on the ground covered in bruises, and just before 9:15 a.m. when he was found, guards could have prevented his death. The same goes for any other JSP staff member who heard Mr. Henegar and other inmates yelling for help.

Mr. Henegar's injuries were extensive. Over the course of hours, Mr. Henegar suffered a broken neck, acute damage to his organs, a lacerated lung, multiple broken ribs, a fractured sternum, internal bleeding, and a brain hemorrhage. Hinton-Leonard stomped on Mr. Henegar's chest and strangled him. Mr. Henegar suffered while the rest of his dorm listened and called for help, and JSP staff did nothing.

Indeed, for weeks leading up to his death, JSP staff were aware of the risk Hinton-Leonard posed, and at no point during that time did anyone do anything to prevent Mr. Henegar's death. Leather belts—which have been banned from prisons all around the country—were not, or should not have been, permitted within JSP, which begs the question of how JSP allowed Hinton-Leonard to have one in the first place. This is a horrifying display of deliberate indifference and reckless disregard for Mr. Henegar's safety and humanity.

## III.    Mr. Henegar's Murder is But One of a Pattern of GDC Inmate Homicides

Tragically, Mr. Henegar's murder was not an isolated incident within GDC. Inmate homicides have been steadily increasing, nearly tripling from 2018/2019 to 2020/2021. Mr. Henegar was 1 of 57 inmates murdered in GDC in 2020 and 2021.[1] The problem with inmate-on-inmate violence has gotten so severe in GDC that the United States Department of Justice opened a highly public investigation in the fall of 2021, months before Mr. Henegar's death.[2] Decision makers at GDC all the way up the chain of command, including but not limited to Commissioner Timothy C. Ward, were aware of the problem with inmate violence, but took no steps to address it. This problem persists, still with no action from GDC policymakers.

---

[1] Danny Robbins, "Records reveal 57 Georgia prison inmates slain," *Atlanta Journal-Constitution*, updated March 4, 2022, https://www.ajc.com/news/crime/records-reveal-53-georgia-prison-inmates-slain/KZ3JV4MT3FH4HLBLZQIA7AFYGA/ (last accessed July 15, 2022).

[2] "Justice Department Announces Investigation into Conditions in Georgia Prisons," Department of Justice, https://www.justice.gov/opa/pr/justice-department-announces-investigation-conditions-georgia-prisons (last accessed July 15, 2022).

Page 5 of 12
*Ante Litem* Notice re: David L. Henegar

<u>Legal Bases for Claims</u>

The Estate and David Jacob Henegar intend to pursue legal claims based on, without limitation, the violation of Mr. Henegar's rights under the Eighth and Fourteenth Amendments, as well as Georgia tort law, including wrongful death. The Estate is entitled to bring the constitutional claims, *see Yule v. Jones*, No. 1:04-CV-2462-WSD, 2010 WL 11426185, at *2 (N.D. Ga. Oct. 21, 2010); O.C.G.A. § 9-2-41, and Mr. Henegar's son is entitled to bring the wrongful death claim, O.C.G.A. § 51-4-2(a).

### Eighth Amendment Failure to Protect

The Eighth Amendment of the United States Constitution required JSP officials to take reasonable steps to protect Mr. Henegar from a known risk of serious harm—in this case, lethal violence at the hands of his cellmate. *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007); *see also Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015) ("It has long been recognized that…prison officials have a duty to protect prisoners from violence at the hands of other prisoners") (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (citations omitted). Through multiple acts of deliberate indifference, JSP staff knew of and consciously disregarded the substantial risk that Mr. Henegar would be seriously harmed by Hinton-Leonard, thereby failing to protect him from harm.

Proving that prison guards abdicated their constitutional duty to keep Mr. Henegar safe requires showing (1) that they had subjective knowledge of a substantial risk that serious bodily harm would befall Mr. Henegar, and (2) that guards acted objectively unreasonably in response to the risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1970); *Rodriguez*, 508 F.3d 611. The Eleventh Circuit has held that the subjective component of the test for deliberate indifference is met in cases of inmate-on-inmate violence when prison guards are "aware that violence had already taken place" between an inmate and a particular assailant and where guards are "aware that [an inmate and their assailant] remained cellmates after the assault, making further conflict likely." *Cox v. Nobles*, 15 F.4th 1350, 1359 (11th Cir. 2021). These factors are easily met here.

In the weeks leading up to Mr. Henegar's murder, JSP learned from multiple sources that Mr. Henegar was at risk. For one, staff knew that Hinton-Leonard was not taking his medication, that he was mentally unstable, and that he posed a risk of harm. Two, Mr. Henegar told JSP staff that he was at risk, and JSP staff knew that Mr. Henegar was afraid of Hinton-Leonard and wanted a housing change for his safety. Most critically, on top of all of this knowledge, JSP staff knew that Hinton-Leonard choked Mr. Henegar on October 9, 2021, to the point that Mr. Henegar lost consciousness.

As for the second prong of the deliberate indifference analysis: "An official responds to a known risk in an objectively unreasonable manner if 'he knew of ways to reduce the harm but knowingly declined to act' or if 'he knew of ways to reduce the harm but recklessly declined to act.'" *Rodriguez*, 508 F.3d at 620 (quoting *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1583 (11th Cir. 1995)). In *Hale*, for instance, another failure-to-protect case, the Eleventh Circuit reversed summary judgment for a sheriff who failed to classify and segregate dangerous inmates, which the plaintiff alleged was a proximate cause of the inmate-on-inmate violence in the jail. *Id*. The

Page 6 of 12
*Ante Litem* Notice re: David L. Henegar

plaintiff in *Hale* established that there were multiple reasonable measures the sheriff could have taken to prevent inmate-on-inmate violence, such as "classifying and segregating the inmates based on their likelihood for violence" and adequately supervising inmates, among other measures. *Id.* The court held that a jury could find that the sheriff's failure to segregate dangerous inmates amounted to deliberate indifference.

Here, JSP staff took no steps to ensure that Hinton-Leonard was housed away from other inmates in order to prevent him from harming others incarcerated in JSP, including Mr. Henegar. JSP staff took no steps to separate Mr. Henegar and Hinton-Leonard, or to otherwise ensure Mr. Henegar's safety. In fact, the reaction was quite the opposite. Guards fanned the flames of the conflict, encouraging Mr. Henegar to fight with Hinton-Leonard—an invitation that Mr. Henegar declined—rather than abiding by their constitutional obligation to protect Mr. Henegar's safety. The *Hale* decision illustrates that the Estate can prove that JSP staff were deliberately indifferent to their duty to protect Mr. Henegar. In his case, JSP staff *never* separated him from Hinton-Leonard—neither after Hinton-Leonard choked Mr. Henegar unconscious on October 9, 2021, nor any point during October 16, 2021 when Hinton-Leonard beat Mr. Henegar to death. It would be hard to imagine a greater showing of deliberate indifference.

This abysmal lack of response from JSP staff gives rise to a strong failure-to-protect claim under the Eighth Amendment. *See also La Marca v. Turner*, 995 F.2d 1526, 1537-38 (11th Cir. 1993) (holding that evidence of "specific, low-cost" actions a prison official could have taken "support[s] the plaintiffs' position that [official] recklessly disregarded the necessary means to protect inmate safety"). The Estate will prevail on this claim.

### Eighth Amendment Failure to Intervene

JSP officials' next display of deliberate indifference, on the day Hinton-Leonard killed Mr. Henegar, was even more pronounced than their first—if that were possible. JSP staff knew that Mr. Henegar was being attacked *and* had a realistic opportunity to intervene to stop the hours-long murder and save Mr. Henegar's life, but instead did nothing. This failure is another Eighth Amendment violation.

While an inmate's claim for a prison official's failure to protect from another inmate covers the time period leading up to the attack, the claim covering the time period after the inmate-on-inmate attack has already begun is a failure to intervene. *See Johnson v. Boyd*, 701 F. App'x 841, 846 (11th Cir. 2017) (reversing dismissal of failure to intervene claim when Plaintiff inmate alleged that at least ten minutes elapsed from the time officers arrived at cell and observed cellmate's attack to when they entered to intervene, that there were enough officers to safely intervene, and that some officers were members of team specifically trained to intervene in such circumstances). Courts analyze failure-to-intervene claims under the same deliberate indifference standard as in failure-to-protect claims. The Eleventh Circuit has suggested that satisfying the "objectively unreasonable" prong of the deliberate indifference analysis for failure-to-intervene claims can be achieved by, for example, "alleging that a significant amount of time elapsed between [an inmate]'s physical assault and the defendants' intervention." *Johnson v. Boyd*, 568 Fed.Appx. 719, 724 (11th Cir. 2014). The Eleventh Circuit has reversed dismissals of failure-to-intervene claims in cases involving much shorter time periods of violence than Mr. Henegar was forced to endure, illustrating that the Estate has a strong claim against JSP

officials for their failure to intervene in Hinton-Leonard's attack. *See Johnson*, 701 F. App'x at 846 (reversing dismissal of failure-to-intervene claim where plaintiff alleged that at least 10 minutes elapsed from the time the officers arrived at the cell where the attack was taking place, and when the officers finally intervened).

Faced with first-hand knowledge that Mr. Henegar was being beaten to death over a period of hours, including hearing the attack and seeing Mr. Henegar on the floor in his cell, JSP staff did not take a single step to intervene. As a matter of law, this level of indifference violates the Eighth Amendment. *See Mosley v. Zachery*, 966 F.3d 1265, 1271 (11th Cir. 2020) (it would be unconstitutional to turn a blind eye "[i]f…a prisoner came running to a corrections official as the prisoner was being chased by his shiv-wielding cellmate who was yelling, 'I will kill you,' and the official knew the cellmate had a history of stabbing other prisoners.") The Estate will succeed on this claim.

### Eighth Amendment Denial of Medical Care

Pursuant to the Eighth Amendment of the United States Constitution, Mr. Henegar was also entitled to adequate medical care while in the custody of the State. JSP staff denied him this right when they ignored his screams and pleas for help on October 16, 2021 as Hinton-Leonard beat him to death. To bring an Eighth Amendment claim of denial of medical care, an inmate must establish an objectively serious medical need. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). This can be proven by showing that an inmate had a medical need "so obvious that even a lay person would easily recognize the necessity for a doctor's attention" that, "if left unattended, poses a substantial risk of serious harm." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). After establishing an objectively serious medical need, an inmate must show that prison officials acted with deliberate indifference, the test for which is laid out in the discussion of an Eighth Amendment failure-to-protect claim, *supra*.

Mr. Henegar had a serious medical need as a result of his assault by Hinton-Leonard on October 16, 2021. Indeed, multiple prisoners housed in JSP's J dormitory, where Hinton-Leonard's attack on Mr. Henegar took place, have stated that Mr. Henegar's screams could be heard throughout the dormitory for hours leading up to his death. The substantial risk of harm to Mr. Henegar's health was obvious to anyone within earshot. Beyond hearing Mr. Henegar's screams, JSP staff saw Mr. Henegar lying on the floor, covered in bruises and cuts, hours before he died. As discussed above, correctional officers saw Mr. Henegar on the floor near his cell door at 6:50 a.m., where he was lying after Hinton-Leonard began attacking him. At that they had a constitutional obligation to seek medical care for Mr. Henegar, yet they did nothing.

"A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011). And that is exactly what happened here. JSP staff completely denied medical care to Mr. Henegar, despite their awareness of his critical medical situations—they failed to alert a medical professional or provide Mr. Henegar with cursory medical care, or even check on him at all. In fact, JSP staff, in causing Mr. Henegar to "needlessly suffer," failed to take *any* step to ensure that Mr. Henegar had access to timely emergency medical care. *McElligott v. Foley*, 182

Page 8 of 12
*Ante Litem* Notice re: David L. Henegar

F.3d 1248, 1257 (11th Cir. 1999). The Estate will succeed on a claim for denial of medical care under the Eighth Amendment.

### Fourteenth Amendment Violation of Due Process

JSP officials' conduct not only reeks of deliberate indifference, but is so abhorrent and shocking that it rises to the level of a violation of Mr. Henegar's Fourteenth Amendment right to due process. The custodial relationship between an inmate and a prison official gives rise to a constitutional duty on the part of the official to protect the inmate. Violating this duty constitutes a violation of the inmate's substantive due process rights. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989) ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause[.]")

JSP officials stripped Mr. Henegar of his ability to protect himself by keeping him confined him in a locked cell with a person known to be dangerous. When JSP staff heard Mr. Henegar screaming for help and saw him on the floor covered in bruises, they walked away, affirmatively placing him in a position of danger he would not have otherwise faced. In violation of Mr. Henegar's Fourteenth Amendment right to due process, JSP staff knew of and consciously disregarded the substantial risk that Mr. Henegar would be seriously harmed while in custody, including from a State-created danger. *Id*. at 200. The Estate can prove a violation of Mr. Henegar's substantive due process rights in either one of two ways: first, by virtue of the custodial relationship; and alternatively/in addition, the Estate can prove a substantive due process violation because JSP staff created the danger through their conduct that shocks the conscience: they permitted Hinton-Leonard to go without his mental health medication for *weeks*, against JSP policy. Under either theory, the Estate can prove a violation of Mr. Henegar's substantive due process rights, protected by the Fourteenth Amendment.

### Civil Conspiracy Under Federal and State Law

JSP staff members reached an agreement among themselves to deprive Mr. Henegar of his rights to be free from unreasonable harm and to receive adequate medical care, and to fail to intervene to prevent harm from occurring to Mr. Henegar. In furtherance of this conspiracy, each of the JSP co-conspirators committed overt acts and was an otherwise willful participant in joint activity, and also creating and promoting a culture of abuse and violence at JSP, giving rise to claims for conspiracy under both federal and Georgia law.

Establishing conspiracy under federal and state law requires largely the same showing. To show conspiracy under § 1983, a plaintiff must allege that officers "reached an understanding or agreement that they would deny the plaintiff one of his constitutional rights," and the conspiracy "resulted in an actual denial of one of his constitutional rights." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1327 (11th Cir. 2015). To prove civil conspiracy under Georgia law, a plaintiff must establish that "two or more persons combined 'either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort.'" *McIntee v. Deramus*, 313 Ga.App. 653, 656 (2012) (citation omitted). "The essential element of the alleged conspiracy

is proof of a common design establishing that two or more persons in any manner, either positively or tacitly, arrive at a mutual understanding as to how they will accomplish an unlawful design.'" *Id.* (quoting *Parrish v. Jackson W. Jones, P.C.*, 278 Ga.App. 645, 649(3) (2006)).

The Estate can establish that JSP staff conspired to violate his constitutional rights and to commit tortious conduct under Georgia common law. First, JSP staff were aware of the substantial risk of serious harm presented by the failure to provide mental health medication to prisoners who needed it and by Hinton-Leonard in particular. Regardless, they agreed to maintain and perpetuate those conditions and expose Mr. Henegar and other prisoners to a substantial risk of serious harm in violation of the Eighth Amendment. Second, JSP staff agreed to permit Hinton-Leonard, who had a known history of violence, to be housed alongside Mr. Henegar even after he expressed a well-founded fear of Hinton-Leonard. Third, JSP staff acted in concert to permit Hinton-Leonard to beat and strangle Mr. Henegar to death without interfering, and impeded the provision of timely medical care to Mr. Henegar. As a direct and proximate result of the illicit agreement referenced above, Mr. Henegar's rights were violated and he suffered physical and emotional injuries and death.

Furthermore, when Mr. Henegar voiced his fears about Hinton-Leonard, JSP staff, rather than responding appropriately to Mr. Henegar's concerns by separating Hinton-Leonard from Mr. Henegar, instead suggested that Mr. Henegar attack Hinton-Leonard while he was handcuffed. Mr. Henegar wrote a letter to his sister Ms. Wade during the final months of his life, in which he described, "When [the guards] put [Hinton-Leonard] in the room and went to shut the door, one of them nodded at me. They wanted me to jump on him while he was cuffed behind his back." This description is illustrative of the culture of violence that JSP staff conspired to establish at the expense of prisoners like Mr. Henegar. The unconstitutional and tortious conduct described above is more than sufficient to state a claim for civil conspiracy under both § 1983 and Georgia law.

### *Warden Caldwell, Deputy Warden Gibbons and Commissioner Ward are Liable for Implementing a Policy and Practice of Enabling and Encouraging a Culture of Violence*

Mr. Henegar's death is attributable to the deliberate indifference of JSP and GDC supervisors and decision makers, who knew about the increasingly high rates of inmate violence, but did nothing to put policies or protocol in place ensuring that inmates received their medication, that mentally ill or dangerous inmates were classified and segregated, or that inmates who reported being attacked by other inmates would not be forced to share a cell with their assailant following an attack.

To hold a supervisor liable for constitutional violations committed by subordinate officers, a plaintiff must prove (1) that there was a constitutional violation and (2) that the supervisor's failure to implement certain policies was deliberately indifferent and caused the plaintiff's injuries. *See Sorensen v. Nocco*, 677 F. App'x 570, 573 (11th Cir. 2017). A causal connection can be established several ways, including "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so." *Matthews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (citations omitted). The notice required is "actual or constructive notice that a particular omission in their training

program causes [prison] employees to violate citizens' constitutional rights." *Sorensen*, 677 F. App'x at 572 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). To show this notice, a plaintiff ordinarily must demonstrate "[a] pattern of similar constitutional violations by untrained employees." *Id.* at 62; *accord Weiland*, 792 F.3d at 1328. Another way to show a causal connection between a supervisor's actions and a violation of an inmate's constitutional rights is when "a supervisor's custom or policy results in deliberate indifference to constitutional rights." *Matthews*, 480 F.3d at 1270.

JSP and GDC policymakers are on both actual and constructive notice of the widespread, repeated violence inside JSP and endemic to GDC prisons across Georgia. In the time period leading up to Mr. Henegar's murder, JSP staff failed to properly investigate and discipline acts of violence, emboldening violent prisoners such as Hinton-Leonard and encouraging a culture of violence. The GDC also has a longstanding policy and practice of failing to protect prisoners from known threats to their safety, including by failing to discipline prisoners for acts of violence, failing to identify and separate prisoners with a known history of violence from potential victims, failing to adequately respond to reports from prisoners that they feared for their safety, and failing to train and discipline subordinates whose known misconduct contributed to these policies and practices. GDC Commissioner Timothy Ward has been aware of these escalating problems, and JSP then-Warden Caldwell and then-Deputy Warden Gibbons maintained these policies and practices even though they knew that the failure to adequately respond to reports of safety concerns from prisoners and to identify, discipline and safely segregate predatory prisoners had contributed to violent incidents in the past. These acts, omissions, policies, and practices are sufficient to hold JSP and GDC supervisors liable for JSP officials' failure to protect Mr. Henegar in the weeks leading up to the attack and failure to intervene at any point between the attack began and when Mr. Henegar breathed his last breath.

### Negligence

In addition or in the alternative, JSP staff were negligent in their failure to provide care to Mr. Henegar. Georgia courts have consistently held that that "a special relation exists between an officer and the prisoner in his custody." *Thomas v. Williams*, 105 Ga.App. 321, 326 (1962). JSP staff owed Mr. Henegar "a duty to keep [him] safely and free from harm, to render him medical aid when necessary, and to treat him humanely and refrain from oppressing him." *Kendrick v. Adamson*, 51 Ga.App. 402, 180 S.E. 647, 648 (1935); *see also Zant v. Prevatte*, 248 Ga. 832, 833 (1982) ("The State has a duty to prisoners in its custody to keep them safe from harm and to render medical aid when necessary.").

JSP staff breached this duty multiple times when they: (1) neglected to provide Hinton-Leonard with mental health medication for weeks; (2) housed Mr. Henegar with Hinton-Leonard despite Mr. Henegar's repeated pleas to be placed in a separate cell, including after Hinton-Leonard choked Mr. Henegar on October 9, 2021—a week before he killed Mr. Henegar; (3) heard Mr. Henegar's screams for help in the hours before his death, but did nothing to intervene; and (4) saw Mr. Henegar on the floor near his cell door in the hours before his death, but failed to perform a wellness check on him.

Page 11 of 12
*Ante Litem* Notice re: David L. Henegar

The inaction of JSP staff is a direct and proximate cause of Mr. Henegar's injuries and his ultimate death. For all of the reasons explained above, including but not limited to the facts that Mr. Henegar was attacked by his cellmate the week before *and* that his murder was audible and obvious for hours, his death was painfully foreseeable. As a result, JSP staff are liable for negligence. "[W]here a[n] [officer] is negligent in his care and custody of a prisoner and as a result the prisoner receives injury or meets his death, or where a[n] [officer] fails in the performance of his duty to the prisoner and the latter suffers injury or meets his death as a result of such failure, the [officer] would, in a proper case, be liable on his official bond, to the injured prisoner or to his dependents as the case might be." *Thomas*, 105 Ga.App. at 326 (quoting *Kendrick*, 51 Ga.App. 402).

### Wrongful Death Claim

Mr. Henegar's son will pursue a claim under Georgia's Wrongful Death Act, O.C.G.A. § 51-4-2. This act permits the child of a decedent to bring a claim to recover for the homicide of a parent where the decedent does not have a surviving spouse, as Mr. Henegar did not. *See generally Carringer v. Rodgers*, 331 F.3d 844 (11th Cir. 2003). "Homicide" as defined by the statute, includes "all cases in which the death of a human being results from a crime, from criminal or other negligence…." O.C.G.A. § 51-4-1(2). Given that the § 1983 and state-law negligence claims will succeed, *see supra*, David Jacob Henegar will recover on the wrongful death claim. Indeed, JSP officials' malice was obvious, and Mr. Henegar's death was a foreseeable consequence of JSP officials' breaches of duty, *see supra*. But for JSP officials' inaction relating to Mr. Henegar and his cellmate, Mr. Henegar would be alive.

The Estate will also pursue an Estate Claim for funeral, burial, and probate expenses, as well as the extreme pain and suffering discussed above.

Mr. Henegar was a trained welder and mechanic. He had been consistently employed in trade positions, including holding jobs as a welder, truck mechanic, and machinist. While incarcerated, he shared his skills with others, teaching his friends how to weld. David Jacob Henegar intends to bring a claim pursuant to O.C.G.A. § 51-4-2 to recover for the full tangible and intangible value of his father's life.

The outlined causes of action herein are not to be construed as conclusive or exhaustive. As the discovery of facts continues in this matter, the Estate and David Jacob Henegar may develop additional claims.

<u>Damages</u>

The Estate is seeking damages related to Mr. Henegar's pain and suffering, fear of another attack, knowledge that Mr. Henegar was pleading for help for weeks asking to be moved to a different cell and in the immediate hours leading to his death, and the costs associated with medical and funeral expenses. The Estate seeks $5 million, including $6,000 for funeral, burial, and probate expenses. David Jacob Henegar is seeking damages for the full value of his father's life. He seeks $5 million.

Page 12 of 12
*Ante Litem* Notice re: David L. Henegar

<u>Offer of Settlement</u>

    The Estate and David Jacob Henegar are amenable to prelitigation negotiation. They are willing to settle their claims in the amount of $10 million. This offer will remain open for 90 days. Should this case not settle by December 28, 2022, the undersigned will file a civil complaint in the United States District Court for the Southern District of Georgia. Should this case proceed to trial, the Estate and David Jacob Henegar will seek punitive damages in addition to the damages stated above. Please contact us should you wish to discuss this matter further. My email address is brady@loevy.com, and my direct line is 312-235-6996. Thank you in advance for your cooperation.

                                    Sincerely,

                                    Rachel Brady
                                    **Attorney for Betty Wade, as Personal**
                                    **Representative of the Estate of David**
                                    **Henegar, and David Jacob Henegar**



USPS TRACKING #

9590 9402 7682 2122 5666 12

United States
Postal Service

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

**Loevy & Loevy Attorneys at Law**

311 N. Aberdeen Street, 3rd floor

Chicago, IL 60607-1249

HENEGAR MONICA

EXHIBIT A

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

GA DEPT OF CORRECTIONS
300 PATROL RD
FORSYTH, GA 30029

|||||||||||||||||||||||||||||||||||||||||||||
9590 9402 7682 2122 5666 12

2. Article Number (Transfer from service label)
7022 0410 0003 4919 9514

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery

RECEIVED
OCT 5 2022
STATE OFFICES SOUTH @ TIFT COLLEGE
MAILROOM

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

**EXHIBIT A**

PS Form 3811, July 2020 PSN 7530-02-000-9053       Domestic Return Receipt



First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

USPS TRACKING #

9590 9402 7682 2122 5666 29

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

**Loevy & Loevy Attorneys at Law**
311 N. Aberdeen Street, 3rd floor
Chicago, IL  60607-1249

HENEGER   NOVICA

EXHIBIT A

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

DEPT. HEADQUARTERS
7 MLK JR DR STE 543
ATLANTA, GA 30334

9590 9402 7682 2122 5666 29

2. Article Number *(Transfer from service label)*

7022 0410 0003 4918 EXHIBIT A

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

x *A. Mardin*    ☑ Agent
                 ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

A. Mardin    10-5-22

D. Is delivery address different from item 1?  ☑ Yes
   If YES, enter delivery address below:  ☐ No

GDC Legal Services
300 Pastral Road
Forsyth, GA 31029

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery
   (00)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt



First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

USPS TRACKING #

ATLANTA METRO 301

9590 9402 7682 2122 5666 05

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

Loevy & Loevy Attorneys at Law
311 N. Aberdeen Street, 3rd floor
Chicago, IL  60607-1249

HENEGAR   MONICA

EXHIBIT A



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

DEPT OF ADMIN SERVICES
RISK MANAGEMENT
200 PIEDMONT AVE STE 1220
WEST TOWER
ATLANTA GA 30334

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

9590 9402 7682 2122 5666 05

2. Article Number *(Transfer from service label)*

7022 0410 0003 4947

EXHIBIT A

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X L Jackson    ☐ Agent
              ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

L Jackson    10-7-22

D. Is delivery address different from item 1?    ☐ Yes
   If YES, enter delivery address below:    ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt